IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MARC L. HAYS and
JENNIFER L. HAYS,
                    *Plaintiffs,*

            v.                                    Case No.  11-CV-1163-JTM-DJW

CONSUMER LAW ASSOCIATES, LLC;
NEIL J. RUTHER; NEW LEAF DEBT,
LLC; and EFA PROCESSING, LP,
                    *Defendants.*

## DEFENDANTS CONSUMER LAW ASSOCIATES, LLC AND NEIL RUTHER'S JOINT MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Defendants Consumer Law Associates, LLC ("CLA") and Neil Ruther jointly move for summary judgment on all of the Plaintiffs' claims.

## INTRODUCTION

CLA is a national law firm that, in accordance with Kansas Rule of Professional Conduct 1.2(c), provides limited-scope representation to clients seeking to negotiate settlements with creditors. CLA's main office is located in Maryland, but the firm employs field attorneys in all 50 states and the District of Columbia. Through a virtual office, CLA field attorneys work with centralized support staff to assist clients in resolving unsecured debt. The representation includes explaining debt settlement strategies, providing case-specific advice, and, if a creditor files suit, preparing responsive pleadings and motions and advising clients how to represent themselves in court.

CLA contracted to represent Plaintiffs Marc and Jennifer Hays and provided that representation to the Plaintiffs' satisfaction. The Hayses now seek a windfall

recovery—including damages under the Kansas Credit Services Organization Act ("KCSOA"), K.S.A. § 50-1116 *et seq.*, imposition of a penalty pursuant to the Kansas Consumer Protection Act ("KCPA"), K.S.A. § 50-623 *et seq.*, declaratory judgments, and an injunction—premised on CLA's alleged failure to comply with the KCSOA. The Plaintiffs do not claim that they were harmed by CLA's alleged noncompliance. In fact, Mrs. Hays wrote the following note to CLA at the conclusion of the representation: "I appreciate all of your assistance in regard to these accounts!!!  You have been awesome!!"

The Plaintiffs' entire case turns on whether the Defendants were exempt from the requirements of the KSCOA.  The Kansas Supreme Court's answer to this Court's certified questions provides the framework for analysis of the exemption: "the law firm of an attorney who is exempt from the requirements of the Act under K.S.A. 50-1116(b) and K.S.A. 50-1117(f) is also exempt from the requirements of the act."  *Hays v. Ruther*, Kan. S. Ct. No. 108,358 (November 22, 2013), at Syl. ¶ 6.  The uncontroverted facts demonstrate that the Plaintiffs were represented by a licensed Kansas attorney acting within the scope of her practice of law and that CLA was that attorney's law firm.  As a result, CLA was exempt, and neither the firm nor its managing member, Mr. Ruther, are liable to the Plaintiffs.  Summary judgment is appropriate for both Defendants.

## STATEMENT OF UNCONTROVERTED FACTS

1. Neil Ruther is the managing member and majority owner of CLA.  He is also an attorney, licensed to practice law in Maryland. Doc. 43, Pretrial Order, Stipulations, ¶ 4.a.1.

2.      CLA is a limited liability company, organized under Maryland law for the purpose

of practicing law. Ex. A, Declaration of Neil Ruther, at ¶ 2; Ex. B, certified copy of

CLA's Foreign LLC Application.

3.      CLA contracted with EFA Processing, LP ("EFA") for the provision of

administrative support for CLA and the use of EFA's copyrighted X-Ware software.

CLA agreed to pay EFA for providing these services and for use of the software. Ex.

A, Declaration of Neil Ruther, at ¶ 3.

4.      Work by attorneys and staff on CLA client matters was recorded via X-Ware

software. Entries were immediately viewable to other users, including field

attorneys, staff attorneys, and administrative staff. Ex. A, Declaration of Neil Ruther,

at ¶ 4.

5.      Through X-Ware's virtual office or via email, field attorneys could provide

directives to CLA's administrative staff to prioritize certain debts for settlement,

stop settlement efforts, or take whatever action they determined was appropriate.

*Id.* at ¶ 5.

6.      Contact notes document the work that CLA performed during the Hayses'

representation, including communications with creditors and the Hayses and

services provided by CLA field attorneys. *See* Ex. C, Contact Notes.

7.      CLA trained EFA administrative staff and employed an on-site attorney who

supervised the staff. Ex. A, Declaration of Neil Ruther, at ¶ 6.

8.    Among CLA's administrative staff are "credit negotiators," paralegals who work with CLA's field attorneys to make offers to and receive offers from clients' creditors. *Id.* at ¶ 7.

9.    CLA employs field attorneys licensed to practice in each of the states in which it provides services. *Id.* at ¶ 8.

10.   CLA field attorneys are responsible for assigned clients in the states in which they are licensed to practice, and firm staff act subject to field attorneys' control in all efforts to settle clients' debts. *Id.*

11.   CLA field attorneys answer clients' legal questions, provide clients legal advice, monitor clients' trust fund accumulation and settlement negotiations, provide instruction to paralegals regarding the settlement of clients' debts, personally negotiate settlements when necessary, and, if litigation arises, advise clients how to proceed in court *pro se* and prepare pleadings, discovery responses, and discovery requests. *Id.* at ¶ 9.

12.   Upon their hire, CLA field attorneys are trained on firm systems and protocols and informed of field attorney responsibilities and firm expectations. Firm management notifies field attorneys regarding updates to firm protocol throughout their employment. *Id.* at ¶ 10.

13.   CLA field attorneys regularly review assigned clients' files to monitor the progress of trust fund accumulation and credit negotiators' efforts to settle clients' debts. *Id.* at ¶ 11.

14.    CLA field attorneys retain constant authority to direct staff to accept or decline settlement offers and to prioritize settlement with certain creditors over others. *Id.* at ¶ 12.

15.    CLA field attorneys can and do personally contact creditors' attorneys to facilitate settlement. *Id.* at ¶ 13.

16.    In general, settlements can be reached for lump sum payments or payment plans, depending on the particular client's situation. Settlements sometimes require a client to provide additional funds beyond what is in his or her trust account. *Id.* at ¶ 14.

17.    On or around September 23, 2009, Plaintiff Jennifer Hays emailed Amina Artis Cook of New Leaf. Ex. D, Jennifer Hays Depo., at pp. 42-43; Ex. C, Contact Notes, 9/23/2009 1:52:06 PM CLA 166.

18.    Mrs. Hays was seeking help with her and her husband's unsecured credit card debt for the following reasons:

Mainly because I knew, you know, we weren't getting anywhere, and even though I was paying more than the minimum amount, because I mean – and, you know, on top of paying that and then granted with the $1300 and then the – because basically I was paying $600 towards all three credit cards and then figuring, you know, the other monthly expenses, as far as what's not on here, like your normal groceries, Walmart, you know, that was pretty much taking up the rest of the finances. And I just – you know, we weren't getting ahead anywhere.

Ex. D, Jennifer Hays Depo., at p. 16.

19.    Mrs. Hays wanted "a way of reducing it, meaning credit card debt, by offering to pay a certain amount and having the balance written off." *Id.* at p. 25.

5

20.   Mrs. Hays did not want to file bankruptcy.  *Id.* at p. 22.

21.   Mrs. Hays had attempted to negotiate with a creditor herself, but she was unsuccessful.  *Id.* at p. 22.

22.   As of October 2009, Mr. and Mrs. Hays had approximately $20,000 in unsecured credit card debt. The minimum monthly payments on these debts totaled about $408.  *Id.* at p. 14.

23.   At that time, Mrs. Hays had been paying more than the minimums each month, usually around $600 per month. *Id.* at pp. 16-17. She candidly admits that she was not unable to make the minimum payments. *Id.* at p. 17.

24.   After Mrs. Hays decided to proceed with debt settlement, Ms. Cook forwarded Mrs. Hays's information to CLA. Ex. C, Contact Notes, entry 10/29/09, 10:46:39 AM, CLA 166.

25.   Mr. and Mrs. Hays electronically completed and sent the Client Retainer Package to CLA on October 29, 2009. Ex. E, Client Retainer Package for Jennifer and Marc Hays; Ex. C, Contact Notes, 10/29/09 1:10:54 PM CLA 166.

26.   Mrs. Hays provided information for CLA's budget form. Ex. D, Jennifer Hays Depo., at 9-10. Based on the information submitted by Mrs. Hays, the Hayses' monthly income was $4,967, their monthly expenses were $3,648, making their total available cash flow $1,319. Ex. F, Budget Form.

27.   When they hired CLA, the Hayses sought to settle three unsecured debts: one account with Capital One in the amount of $1,481.25 and two accounts with Chase

in the amounts of $4,422.05 and $14,397.06. Doc. 43, Pretrial Order, Stipulations, ¶ 4.a.6.

28. When the Hayses hired CLA, the client engagement agreement required payment of: (1) an initial consultation fee of $199, (2) a legal fee equal to 10% of their total unsecured debt, divided over a payment plan of nine to twelve months, and (3) an $85 monthly service fee. The Hayses first monthly payment of $402 covered the initial consultation fee and the first monthly installment of the legal fee. Subsequent monthly payments of $345 were designed to cover legal and service fees and to build the value of the Hayses' trust account to be utilized to fund settlements with creditors. The Hayses periodically paid monthly installments in excess of the $345 minimum in order to more quickly build the value of their trust account to fund settlements. *Id.*, ¶ 4.a.3.

29. After a retainer package is submitted, but before assignment to a field attorney, CLA staff attorneys perform an "underwriting." It is designed to verify that all necessary information has been collected and that the person appears to be an appropriate candidate for debt settlement. Ex. A, Declaration of Neil Ruther, at ¶ 15.

30. When a field attorney is assigned a client, the attorney is expected to and trained to discuss the client's individual circumstances, describe the process of debt settlement, and determine if there are any circumstances unique to the client that make debt settlement unlikely to be successful. If there are, the field attorney may recommend bankruptcy or another option. The field attorney answers any questions the client

has about his or her circumstances and legal options in dealing with his or her debt. *Id.* at ¶ 16.

31.     After the initial consultation, if CLA learns that the client is being harassed by creditors or prefers not to receive any creditor notices, CLA sends letters to the client's creditors informing them that the client is represented by the law firm and that notices should be sent to CLA. The firm also brings actions on behalf of clients to enforce their rights under the federal Fair Debt Collection Practices Act. *Id.* at ¶ 17.

32.     CLA assigned Kansas licensed field attorney, Laura Simpson-Redmond, to represent Jennifer and Marc Hays. Doc. 43, Pretrial Order, Stipulations, ¶ 4.a.2.

33.     Laura Simpson-Redmond is licensed to practice law in Kansas and has been so licensed since September 20, 1985. Ex. G, Kansas Supreme Court Certificate of Good Standing for Laura Simpson-Redmond.

34.     Since September 2009, Laura Simpson-Redmond has spent roughly 40 hours per week representing clients as a field attorney for CLA and its sister firm, Persels & Associates, LLC.  Ex. A, Declaration of Neil Ruther, at ¶ 18.

35.     When Laura Simpson-Redmond was assigned to the Hayses file, she called Mrs. Hays to discuss her representation. Specifically, Ms. Simpson-Redmond noted the substance of the call as follows:

Initial consultation: conducted; Spoke with Jennifer Hays; discussed my role as the attorney on the plan; discussed debt summary points; discussed the possible tax implications and advised her to talk with her tax advisor; specifically advised the client of the possibility of litigation while on the plan;

gave specific jurisdictional advice re: litigation, civil process, judgments, wage garnishments, possible exemptions, she has only skimmed retainer agreement and I asked her to read it because it has valuable information in it and give me a call if she has any questions. Client understood.

Ex. C, Contact Notes, 11/20/2009 11:05:10 AM CLA 165.

36.     Thereafter, Ms. Simpson-Redmond regularly reviewed the Hayses' file to monitor

the progress of trust fund accumulation and the negotiating team's efforts to settle

the Hayses' debts. *See, e.g.,* Ex. C, Contact Notes, 12/21/2009 5:03:18 PM CLA 164;

1/21/2010 11:56:24 AM CLA 164, 2/26/2010 10:15:49 AM CLA 161; 3/30/2010

6:48:07 PM CLA 160; 5/3/2010 8:55:52 PM CLA 160; 6/3/2010 1:48:39 PM CLA 157;

7/14/2010 6:14:25 PM CLA 156; 8/15/2010 8:49:53 PM CLA 148; 9/15/2010 8:28:52

PM CLA 147; 10/15/2010 3:09:36 PM CLA 144; 11/15/2010 11:42:24 PM CLA 141;

11/30/2010 1:40:47 PM CLA 139.

37.     The Hayses made their first payment to CLA in the amount of $402 on November

19, 2009. They paid a total of $6,697 into the trust account while they were

represented by CLA. From this amount, CLA received a total of $3,419.04 in fees.

Doc. 43, Pretrial Order, Stipulations, ¶ 4.a.4.

38.     The Hayses were represented by CLA for approximately fourteen months *Id.,* ¶

4.a.5.

39.     During CLA's representation, the Hayses were able to set aside a significant amount

of their income in savings accounts. Ex. D, Jennifer Hays Depo., at pp. 49-50.

40.     When the Hayses accumulated sufficient funds in CLA's trust account, CLA's credit

negotiators contacted creditors to try to settle their debts. *See generally* Contact

Notes; *see, e.g.,* Ex. C, Contact Notes, 3/17/2010 1:43:54 PM CLA 161; 4/16/2010

7:23:55 AM CLA 160; 5/6/2010 7:05:59 PM CLA 160; 5/17/2010 2:22:05 PM CLA

158-59; 6/4/2010 1:51:52 PM CLA 157; 7/22/2010 4:19:14 PM CLA 152; 7/30/2010

2:05:17 PM CLA 150; 7/30/2010 2:12:23 PM CLA 150; 8/11/2010 12:23:07 PM CLA

149; 8/12/2010 9:05:26 AM CLA 148; 10/5/2010 4:18:30 PM CLA 146; 10/6/2010

9:57:44 AM CLA 146; 11/9/2010 9:20:51 AM CLA 143; 11/9/2010 1:02:34 PM CLA

142-43; 11/23/2010 8:41:00 AM CLA 139.

41.     During the course of their representation, the Hayses were sued by one of their

creditors, Capital One. Mrs. Hays called CLA on November 30, 2010, and stated that

she had received a summons. Doc. 43, Pretrial Order, Stipulations, ¶ 4.a.7.

42.     Ms. Simpson-Redmond learned of the legal action that same day. She returned Mrs.

Hays's call about the lawsuit on December 1, 2010, and left a message. *Id.*

43.     Ms. Simpson-Redmond first spoke to Mrs. Hays about the lawsuit on December 3,

2010. *Id.* During this phone call, Ms. Simpson-Redmond reviewed the court process

with Mrs. Hays. Ex. C, Contact Notes, 12/3/2010 1:58:36 PM CLA 139.

44.     David Herron, another Kansas field attorney with CLA, spoke to Mrs. Hays on

December 8, 2010, reviewed the petition filed by Capital One, and drafted an answer

to it. The answer contained an error, so he corrected the pleading and sent it to Mrs.

Hays on December 9, 2010. Doc. 43, Pretrial Order, Stipulations, ¶ 4.a.8.

45.   David Herron is licensed to practice law in Kansas and has been so licensed since April 23, 1993. Ex. H, Kansas Supreme Court Certificate of Good Standing for David Herron.

46.   Since August 2008, David Herron has worked roughly 40 hours per week as a field attorney for CLA and its sister firm, Persels & Associates, LLC. Ex. A, Declaration of Neil Ruther, at ¶ 20.

47.   Ms. Simpson-Redmond spoke to Mrs. Hays on December 10, 2010, to follow up regarding the Capital One lawsuit. Doc. 43, Pretrial Order, Stipulations, ¶ 4.a.9.

48.   CLA negotiated a compromise with Capital One on January 7, 2011. Valentine, Zimmerman & Zimmerman, P.A. accepted $1,500 in settlement of the Capital One debt account, which had a balance of $2,006.91 at the time of the settlement. Doc. 43, Pretrial Order, Stipulations, ¶ 4.a.10. Field attorney Simpson-Redmond personally negotiated this settlement and received approval from Mrs. Hays. Ex. C, Contact Notes, 1/7/2011 10:45:11 AM, 11:00:17 AM CLA 134-35.

49.   The Hayses negotiated compromises of their other two debt accounts on their own, notwithstanding CLA's attempts to also settle the accounts. The clients settled Chase account ending 3269 on or about November 10, 2010, and Chase account ending 7196 on or about January 13, 2011.  Doc. 43, Pretrial Order, Stipulations,  ¶ 4.a.11.

50.   Mrs. Hays notified CLA, by a letter dated January 13, 2011, that they had settled the two accounts with Chase.  Mrs. Hays concluded her letter by saying: "I appreciate all of your assistance in regard to these accounts!!! You have been awesome!!"  Doc.

43, Pretrial Order, Stipulations, ¶ 4.a.12. A copy of the letter is attached as Ex. I and incorporated by reference.

51.     Of the debts for which the Hayses sought assistance, the Hayses ultimately paid approximately 30% of the balances owed.  Ex. D, Jennifer Hays Depo., at p. 95.

52.     CLA returned the balance of the Hayses' escrow account in the amount of $277.96 on January 27, 2011. Doc. 43, Pretrial Order, Stipulations, ¶ 4.a.13.

53.     Mrs. Hays faxed an order of dismissal for the Capital One litigation to CLA on February 8, 2011. The Hayses' account status was changed to "settled" on February 11, 2011, and the representation was effectively terminated.  *Id.*, ¶ 4.a.14.

54.     Mrs. Hays requested a copy of the Capital One settlement agreement on February 22, 2011, which was sent to her via email. Mrs. Hays confirmed receipt of the document.  *Id.*, ¶ 4.a.15.

55.     Until commencement of the present lawsuit, there was no further contact between the Hayses and CLA.  *Id.*, ¶ 4.a.16.

56.     During the course of her representation, Mrs. Hays did not know that CLA was not registered with the Office of the State Bank Commissioner. Ex. D, Jennifer Hays Depo., at p. 32. She believes CLA's services would have been no different had CLA been registered. *Id.* at p. 33.

57.     Mrs. Hays admits she has not been aggrieved by CLA or Mr. Ruther, and does not feel damaged by any of their actions. *Id.*, at pp. 31, 34, 61-62.

58.   Yet, Mrs. Hays believes she and her husband are due, at a minimum, $6,697. This is the total amount she and her husband paid into CLA's trust accounts, including amounts paid out in settlement of their debts. *Id.,* at pp. 65-66.

59.   Mrs. Hays believes she and her husband deserve an additional $10,000 from CLA and Mr. Ruther in compensatory damages and punitive damages. *Id.* at pp. 68-69.

60.   Mrs. Hays does not know who Neil Ruther is and has never had any contact with him. *Id.,* at p. 71.

## ARGUMENTS & AUTHORITIES

The KCSOA contains an attorney exemption that specifically precludes application of its provisions to actions taken in the course and scope of an attorney's law practice. When CLA represented the Hayses, the exemption read, "Any person licensed to practice law in this state acting within the course and scope of such person's practice as an attorney shall be exempt from the provisions of [the KCSOA]." K.S.A. § 50-1116(b) (2005). In response to questions certified in this case, the Kansas Supreme Court clarified that "the law firm of an attorney who is exempt from the requirements of the Act under K.S.A. 50-1116(b) and K.S.A. 50-1117(f) is also exempt from the requirements of the act." *Hays v. Ruther*, Kan. S. Ct. No. 108,358 (November 22, 2013), at Syl. ¶ 6.

Under the framework supplied by the Kansas Supreme Court, it is clear that CLA was exempt from the KCSOA at all times relevant to this suit. Laura Simpson-Redmond, a Kansas licensed attorney, represented the Plaintiffs. All actions she took on their behalf were within the course and scope of her law practice. CLA was her law firm, and she was

acting as CLA's agent. Additionally, while not required for exemption, all relevant actions taken by CLA, by and through its other agents, were within the course and scope of Ms. Simpson-Redmond's practice.

The Plaintiffs' entire case rests on alleged violations of the KCSOA. Because CLA was exempt from the KCSOA at all times relevant to this suit, all the Plaintiffs' claims against it fail. All claims against Mr. Ruther, based solely on his status as the managing member of CLA, flounder for the same reason.

I.     **CLA is exempt from the KCSOA.**

    A.     **CLA field attorneys, Laura Simpson-Redmond and David Herron, are exempt from the requirements of the KCSOA.**

The Kansas Supreme Court's opinion answering questions certified from this case dictates that the first point of inquiry is whether there is an attorney who is exempt from the requirements of the KCSOA. *Hays*, at Syl. ¶ 6. There is. With respect to the matters CLA handled for the Hayses, at least two attorneys provide the foundation for CLA's exemption. Field attorneys Laura Simpson-Redmond and David Herron, who assisted the Plaintiffs within the ordinary course of their regular law practices, are both exempt from the requirements of the KCSOA.

        1.     **In representing the Hayses, Laura Simpson-Redmond and David Herron were acting within the ordinary course of their regular law practices.**

The Kansas Supreme Court has stated that "[t]he general meaning of the term [the practice of law] is of common knowledge, although the boundaries of its definition may be indefinite as to some transactions." *State ex rel. Boynton v. Perkins*, 138 Kan. 899, 907

14

(1934). In analyzing whether the term is applicable to certain actions, the court has borrowed definitions from other states' courts. It has thus recognized that the practice of law "includes legal advice and counsel, and the preparation of legal instruments and contracts by which legal rights are secured, although such matter may or may not be depending in a court." *Id.* at 908 (quoting *Eley v. Miller*, 7 Ind. App. 529, 34 N.E. 836 (1893)). "In litigated matters it involves not only the actual representation of the client in court, but also services rendered in advising a client as to his cause of action or defense. The practice of law also includes the giving of advice or rendering services requiring the use of legal skill or knowledge. . . ." *Id.* (quoting *The People v. Peoples Stock Yards Bank*, 344 Ill. 462, 176 N.E. 901 (1931)).

In 2004, the Kansas Bar Association Unauthorized Practice of Law Committee recommended the following definition of the practice of law:

> The practice of law is ministering to the legal needs of another person and the application of legal principles and judgment with regard to the circumstances or objectives of another person which require knowledge of legal principles or the use of legal skill or knowledge.

Ex. J, KBA UPL Committee Definition Report, Amended and Adopted 5/11/04, Page 1.

The KBA's recommendation lists the following examples that fulfill the general definition:

> (2) Giving advice, counseling or rendering services to any person concerning or with respect to their legal rights or any matter involving the application of legal principles to rights, duties, obligations or liabilities.
>
> (3) Selecting, drafting, or completing any legal document or agreement involving or affecting the legal rights of a person.
>
> . . .

> (5) Negotiating or settling of a claim, legal right or responsibility on behalf of another person.

*Id.*

CLA assigned Kansas-licensed field attorney, Laura Simpson-Redmond, to handle the Hayses' matters. Statement of Uncontroverted Facts ("SOF"), ¶ 32. As a field attorney, Ms. Simpson-Redmond's responsibilities include answering clients' legal questions, providing legal advice, monitoring settlement negotiations, providing instruction to paralegals regarding the settlement of debts, personally negotiating settlements when necessary, and, if litigation arises, advising clients how to proceed in court *pro se* and preparing pleadings, discovery responses, and discovery requests. SOF, ¶ 11.

As the record reflects, Ms. Simpson-Redmond fulfilled her field attorney duties in representing the Plaintiffs. During the duration of the Hayses' representation, Laura Simpson-Redmond retained constant authority to direct staff to accept or decline settlement offers and to prioritize settlement with certain creditors over others. *See* SOF, ¶ 14. She provided legal advice during her initial phone conversation with Mrs. Hays, reviewing possible tax implications of the debt settlement strategy and jurisdiction-specific information regarding litigation, civil process, judgments, wage garnishments, and possible exemptions. SOF, ¶ 35. When Capital One sued the Hayses, Ms. Simpson-Redmond personally negotiated a settlement that reduced the amount they owed from $2,006.91 to $1,500.00 and obtained Mrs. Hays's approval. SOF, ¶ 48.

While Ms. Simpson-Redmond was the Hayses' primary attorney with the firm, her colleague, David Herron, also assisted in their representation. Mr. Herron is a field

16

attorney for CLA who has been licensed to practice law in Kansas since 1993. SOF, ¶¶ 45-46. When Capital One sued the Hayses, Mr. Herron discussed the lawsuit with Mrs. Hays, reviewed the petition, and the drafted an answer for the Hayses to file in the case. SOF, ¶ 44.

Even if the boundaries of what constitutes the practice of law are indefinite as to some transactions, this is not a boundary line case. When the Hayses hired CLA, their circumstances were such that they had accumulated a substantial amount of consumer debt. SOF, ¶¶ 22, 27. Their objective was to reduce the amounts owed and pay off the remaining debt. SOF, ¶ 19. Mrs. Hays did not want to file for bankruptcy. SOF, ¶ 20. Laura Simpson-Redmond and David Herron ministered to the Plaintiffs' needs with regard to their circumstances and objectives by using their legal knowledge and skills—providing advice about the legal implications of their indebtedness and the legal courses of action open to them, drafting a legal document affecting their legal rights, and successfully negotiating on their behalf to reach a resolution to a claim. SOF, ¶¶ 35, 36, 42-44, 47-48. The work Ms. Simpson-Redmond and Mr. Herron performed in representing the Plaintiffs fits squarely within foregoing definitions of the "practice of law."

Two legal experts who have reviewed the nature of CLA's practice and the facts of this case have already concluded as much. The Defendants retained legal ethics expert Charles W. Wolfram to examine the nature of CLA's law practice. Ex. K, Declaration of Charles W. Wolfram, at ¶ 2. Upon doing so, Mr. Wolfram concluded that "the debt settlement and other law-practice activities of the Defendants in Kansas are the 'practice

of law' and, as such, are exempt from regulation under the terms of the Kansas Credit

Services Organization Act. *Id.* at ¶ 5. In his written declaration, Mr. Wolfram opines that:

"[l]awyers are clearly practicing law when they negotiate on behalf of their clients." *Id.* at

¶ 11. But he also notes that field attorneys' representation of clients involves a myriad of

other "law-practice activities":

> Among other law-practice activities, the Firm's Kansas admitted lawyers
> counsel their clients about the legal implications of their indebtedness and
> about legal courses of action open to them. Those lawyers also prepare
> answers to arbitration demands, answers to lawsuits, and responses to
> discovery demands by creditors, draft affirmative discovery demands, and
> draft and send cease and desist letters to creditors. They also help clients to
> pursue litigation against creditors who violate state and federal
> debt-collection laws and counsel clients on how to conduct court
> proceedings, how to assert exemptions of certain of their assets from being
> seized by creditors through execution, and how to respond to postjudgment
> discovery by a creditor.

*Id.* at ¶ 14.

The Defendants also engaged J. Nick Badgerow, Esq. to express his opinions on the

allegations in the Complaint insofar as they implicate the practice of law. Mr. Badgerow

concluded that "CLA is a law firm which practices law through its attorneys (including

Simpson-Redmond and Herron) and its other staff and contractors." Ex. L, Declaration of

J. Nick Badgerow, at ¶ 37. Mr. Badgerow noted that this law practice, generally, and CLA's

law practice, specifically, encompasses a broad array of services:

> In the ordinary course - and specifically in the case of CLA under its Retainer
> Agreement - a law firm's legal representation includes both specific "legal"
> advice and service (such as negotiating with creditors, drafting pleadings, or
> advising about court appearances) and activities which, standing alone,
> might be considered not to be included within a "law practice," such as
> keeping track of debts, accounts, and offers. But the combined services are

all a part of the legal representation by the law firm, which Hays retained
CLA to provide.

*Id.* at ¶ 35. The negotiations, drafting, advice, and tracking of debts, accounts, and offers

were all part of the field attorneys' ordinary law practice.

At all relevant times, Laura Simpson-Redmond and David Herron were "[persons]

licensed to practice law in this state acting within the course and scope such person[s']

practice as [attorneys]." K.S.A. § 50-1116(b) (2005). Ms. Simpson-Redmond and Mr. Herron

are, therefore, "[attorneys] who [are] exempt from the requirements of the [KCSOA]."

*Hays*, at Syl. ¶ 6.

> **2.    All relevant actions taken by CLA, by and through its agents, were
> within the course and scope of a licensed Kansas field attorney's
> practice.**

Although not identified by the Kansas Supreme Court as part of the test for law firm

exemption from KCSOA requirements, the Defendants note that all relevant actions taken

by CLA, by and through its agents, were within the course and scope of the practice of

licensed Kansas attorney, Laura Simpson-Redmond.

CLA field attorneys are ultimately responsible for handling assigned clients'

matters, SOF, ¶ 10, but firm staff assist them in meeting clients' needs and reaching clients'

goals.  For example, "credit negotiators" make offers to and receive offers from clients'

creditors, SOF, ¶ 8, while field attorneys retain constant authority to direct them to accept

or decline settlement offers and to prioritize settlement with certain creditors over others,

SOF, ¶ 14. Notes entered by credit negotiators in the Hayses' X-Ware file were immediately

viewable to other users, SOF, ¶ 4, enabling field attorney, Laura Simpson-Redmond, to

monitor the progress of communications with creditors' representatives during her regular reviews of their file.

The firm's heavy use of staff is a cost-saving measure that makes the representation economical for individuals who would not be able to afford legal services otherwise. Ex. K, Declaration of Charles W. Wolfram, at ¶¶ 21-24.  Because the buck stops with CLA's attorneys, SOF, ¶¶ 10, 14, staff efforts are all within the course and scope of the attorneys' practices. *See* Ex. L, Declaration of J. Nick Badgerow, at ¶ 33 ("Moreover, its non-lawyers work under the direction of a supervising attorney. This includes the non-lawyers at EFA, which is contracted under express provisions vesting supervision and responsibility in CLA. This is an appropriate and quite usual procedure in the practice of law."); *see also* Ex. K, Declaration of Charles W. Wolfram, at ¶ 22 ("I see no evidence in the record suggesting that . . . any of [CLA's nonlawyer paraprofessionals'] work was performed other than pursuant to policies and other measures put in place by CLA lawyers and under CLA lawyers with managerial authority over them.").

**B.    As the law firm of attorneys who are exempt from the requirements of the KCSOA, CLA is also exempt from the KCSOA.**

The exemption is applicable to CLA if, at all relevant times, it was "the law firm of an attorney who is exempt from the requirements of the Act under K.S.A. 50-1116(b)." *Hays*, at Syl. ¶ 6.  As discussed above, Laura Simpson-Redmond and David Herron are attorneys who are exempt from the requirements of the KCSOA under K.S.A. 50-1116(b). At all relevant times, CLA was their firm.  Therefore, CLA was exempt from KCSOA regulations.

20

### 1.    CLA is a law firm.

The KCSOA defines a law firm as "a lawyer or lawyers in a law partnership, professional corporation, sole proprietorship or other association authorized to practice law; or lawyers employed in a legal services organization or the legal department of a corporation or other organization." K.S.A. 50-1117(f) (2012).[1] In accordance with this definition, CLA is a law firm. Ex. L, Declaration of J. Nick Badgerow, at Part IV.

CLA is a limited liability company organized in Maryland and comprised of lawyers. SOF, ¶¶ 2, 9. The Kansas revised limited liability company act provides that a foreign limited liability company is governed by the laws of the state under which it is organized, subject to the parameters set by K.S.A. § 17-7668 regarding the types of business allowed to operate as limited liability companies. K.S.A. § 17-76,120. Maryland limited liability companies are authorized to "render professional services[2] within or without [the State of Maryland]." Md. *Corporations and Associations* Code Ann. § 4A-203 (2013). And K.S.A. § 17-7668(c) permits limited liability companies qualified to conduct business in Kansas to "have and exercise all powers which may be exercised by a Kansas professional association or professional corporation under the professional corporation law of Kansas,

---

[1] The Kansas Supreme Court determined that the 2012 amendments to the KCSOA clarified the Act. *Hays*, at 8. Presumably, this means that the definition of "law firm" added in 2012 was the definition intended at the statute's inception. Before 2012, the Act did not define the term. However, Kansas Rule of Professional Conduct 1.0(d) provided identical language.

[2] Like its Kansas statutory counterpart, Maryland's definition of "professional service" includes the services of an attorney. K.S.A. § 17-2707(b)(3); Md. *Corporations and Associations* Code Ann. § 5-101(g)(2)(ii).

including employment of professionals to practice a profession." As a matter of public record, CLA is properly registered to do business in Kansas with the stated purpose of "the practice of law." *See* Ex. B, certified copy of CLA's Foreign LLC Application; K.S.A. §§ 17-76,121.[3] CLA meets the KCSOA's—and Kansas Supreme Court's—definition of "law firm." It is, therefore, eligible for exemption from KCSOA regulation.

### 2.    At all relevant times, CLA was the field attorneys' law firm.

The field attorneys who performed work for the Plaintiffs were agents of CLA during the course of the Plaintiffs' representation. Because of this agency relationship, CLA was their law firm.

An agent is one who acts on behalf of another subject to his control. Restatement (Third) of Agency § 1.01 (2006). Laura Simpson-Redmond and David Herron work full time for CLA. SOF, ¶¶ 34, 46. While they exercise independent legal judgment in representing clients, the methods and means of their daily practices are guided by firm training and protocol. SOF, ¶ 12. CLA field attorneys are, thus, agents of the firm.

That the field attorneys are employed pursuant to independent contractor agreements and receive Form 1099s is irrelevant, as the terms "agent" and "independent contractor" are not mutually exclusive. *Milligan v. Anderson*, 522 F.2d 1202, 1207 (10th Cir.

---

[3] The Defendants note that CLA practices in Kansas pursuant to the same requirements as any law firm organized in another state. Baker Sterchi Cowden & Rice, L.L.C., organized under Missouri law, practices in Kansas pursuant to the same law and procedure. *See* Ex. M, certified copy of Baker Sterchi Cowden & Rice's Foreign LLC Application. Kutak Rock, LLP, a national law firm, is organized under Nebraska law. It is qualified to transact business in Kansas by filing a statement of qualification substantially similar to the foreign LLC application. *See* Ex. N, certified copy of Kutak Rock's Foreign LLP Statement of Qualification.

1975) ("We do not believe the terms 'agent' and 'independent contractor' to be necessarily mutually exclusive."); Restatement (Second) of Agency § 1, cmt. e. ("[a]n agent may be one for whose physical acts the employer is not responsible and who is called an independent contractor in order to distinguish him from a servant, also an agent, for whose physical acts the employer is responsible."). To prevent improper usage and confusion, the Third Restatement of Agency eliminated the term "independent contractor" altogether. Restatement (Third) of Agency § 1.01, cmt. c Restatement (Third) of Agency § 1.01, cmt. c ("[T]he common term 'independent contractor' is equivocal in meaning and confusing in usage because some termed independent contractors are agents while others are nonagent service providers. The antonym of 'independent contractor' is also equivocal because one who is not an independent contractor may be an employee or a nonagent service provider. This Restatement does not use the term 'independent contractor,' except in discussing other material that uses the term."). Clearly, an independent contractor may be an agent.

The Kansas Supreme Court's definition of "law firm" makes no distinction between the employment statuses of firm members. *See* Kansas Supreme Court Rule 226; Kan. R. Prof. C. 1.0. Rather, the scope of the term is broad. Comment [2] to Kan. R. Prof. C. 1.0 notes that attorneys who share office space and appear to the public to be a firm, despite having no contractual obligation to one another, can be regarded as a firm under the rule. As legal expert Charles W. Wolfram observed in his written declaration, "If two solo practitioners who are not contractually related in any way can nonetheless be properly considered a 'firm,' as the Comment states, then it must follow that any of the Firm's field attorneys who

are contractually related to CLA would necessarily also be part of the CLA 'firm.'" Ex. K, Declaration of Charles W. Wolfram, Esq., at ¶ 17.

For the duration of the Plaintiffs' representation, Ms. Simpson-Redmond and Mr. Herron practiced law on behalf of CLA and subject to CLA's direction and control.  At all times relevant to this suit, the field attorneys were CLA's agents, and CLA was their law firm. As "the law firm of an attorney who is exempt from the requirements of the Act under K.S.A. 50-1116(b) and K.S.A. 50-1117(f)," CLA is "also exempt from the requirements of the act." *Hays,* at Syl. ¶ 6.

## II.    Summary judgment for the Defendants is appropriate on all counts.

All counts in the Complaint turn on whether CLA was subject to the KCSOA during its representation of the Plaintiffs. As explained in detail in Part I, CLA was exempt from the KCSOA. Therefore, summary judgment for CLA is appropriate on all counts. As Mr. Ruther's alleged liability is entirely dependent on CLA's, *see* Doc. 1, Complaint, at ¶ 20; Doc. 43, Pretrial Order, Plaintiffs' Factual Contentions, ¶ 5.a.1, Mr. Ruther is entitled to summary judgment on the same basis.

In addition to failing in their main premise, all counts in the Plaintiffs' Complaint have further deficiencies. Because the Plaintiffs are not "aggrieved consumers," they are not eligible to recover damages or penalties provided for under the KCPA. The Plaintiffs lack standing to request the declarations and injunction they seek, as their contract with the Defendants was fully executed long ago. And the Plaintiffs' civil conspiracy allegation fails for lack of damages in addition to the lack of unlawful acts.

Accordingly, Defendants CLA and Ruther respectfully request summary judgment on all counts.

## A.    Count One: Damages and Penalties

The Plaintiffs' claims under the KCPA are completely derivative of their claims under the KCSOA. Doc. 1, ¶ 32 ("Defendants are in violation of K.S.A. 50-626(a) by virtue of K.S.A. 50-1132 which provides that "Any violation of this act or any rule and regulation promulgated thereunder is a deceptive act or practice under the Kansas consumer protection act. . . ."); Doc. 43, Pretrial Order, Theories of Recovery, ¶ 6.a. ("All defendants have violated the KCSOA (and therefore also the KCPA)"). Thus, the Plaintiffs' claims under the KCPA must fail wherever their KCSOA claims fail. Analysis respecting the KCSOA allegations is set out in Part I of this brief. In summation, at all relevant times, CLA was the law firm of an attorney exempt from the requirements of the KCSOA and, therefore, exempt from the requirements of the KCSOA. Mr. Ruther cannot be held liable for the exempt actions for his firm. For these reasons, Count One fails as to all claims.

All KCPA claims fail on the independent basis that the Plaintiffs are not "aggrieved consumers" under the act. *See* K.S.A. § 50-636(a) (providing that a violation of the KCPA renders the violator liable only to an "aggrieved consumer"). The Plaintiffs admittedly were not harmed by any of the Defendants' acts. SOF, ¶ 57. The Plaintiffs paid off their unsecured debt for approximately 30% of what they owed, SOF, ¶ 51, just as Mrs. Hays desired when she originally sought assistance in reducing her consumer debt, SOF, ¶ 19. The Plaintiffs were satisfied with this result. SOF, ¶ 50. And Mrs. Hays feels that CLA's

services would not have been any different had CLA registered under the KCSOA. SOF, ¶ 56.

The Plaintiffs' requests for damages and penalties should be denied.

### B.     Count Two: Declaratory and Injunctive Relief

In Count Two, the Plaintiffs' seek "a declaration that the defendants' acts violated the Kansas Credit Services Organizations Act and the Kansas Consumer Protection Act pursuant to K.S.A. 50-634(a)(1), and an injunction against future violations pursuant to K.S.A. 50-634(a)(2)." Doc. 1, at ¶ 35. Additionally, the complaint asks for a declaration that the "defendants' written agreement with the plaintiff is a violation of Kansas criminal law by virtue of both K.S.A. 50-1131 and K.S.A. 21-4402" and because of this the "the contract is void and unenforceable." Doc. 1, at ¶ 36.

Count Two fails for the same reason that Count One fails: the Defendants were exempt from the requirements of the KCSOA and, therefore, did not violate it or the KCPA. Additionally, because the Plaintiffs admittedly are not aggrieved consumers, no private remedies provided under the KCPA are available to them. "Generally, a consumer may not bring a private action under the KCPA unless the consumer can prove that the seller has aggrieved the consumer. K.S.A. 50-634. To be aggrieved under the statute, the consumer must prove that the seller's act has adversely affected the consumer's legal rights." *Schneider v. Liberty Asset Mgmt.*, 45 Kan. App. 2d 978, 985 - 986 (Kan. Ct. App. 2011) (citing *Finstad v. Washburn University*, 252 Kan. 465, 468-69, 474, 845 P.2d 685 (1993)). Moreover, "the consumer must show that there was a causal connection between the deceptive act

and the claimed injury." *Id.* (citing *Finstad*, 252 Kan. at 470). As discussed above, the Plaintiffs paid off their unsecured debt for approximately 30% of what they owed, SOF, ¶ 51, just as Mrs. Hays desired when she originally sought assistance in reducing her consumer debt, SOF, ¶ 19. The Plaintiffs admittedly were not aggrieved. SOF, ¶ 57. The Plaintiffs do not meet the requirements to bring a cause of action pursuant to K.S.A. § 50-634.

The Plaintiffs also lack standing to request a declaration and injunction. "To have standing ... plaintiff[s] bear[] the burden of showing that (1) [they] suffered an injury in fact that is (a) concrete and particularized and (b) actual and imminent, not merely conjectural or hypothetical; (2) the injury is fairly traceable to the defendant[s'] conduct; and (3) a favorable decision is likely to redress [their] alleged injuries." *White v. Sam's East, Inc.*, Case No. 12-cv-2618-CM, 2013 U.S. Dist. LEXIS 98707, *4 (D. Kan. July 16, 2013) (*citations omitted*). "When seeking prospective relief, a plaintiff must suffer a continuing injury or be under a real and immediate threat of being injured in the future." *Id.* at *5. The Plaintiffs lack standing because they admittedly have not suffered any injury. SOF, ¶ 57. Moreover, CLA fulfilled all contractual duties to the Plaintiffs long ago. SOF, ¶¶ 51-55. The Plaintiffs are not suffering a continuing injury. Nor are they under a real and immediate threat of being injured in the future. The Plaintiffs cannot establish the remedies they seek would remedy any harm (which Plaintiffs deny occurred). SOF, ¶ 57; *see also White*, 2013 U.S. Dist. LEXIS 98707 at *7 ("Even if plaintiffs were to amend their complaint to include information about the value of their memberships with and without security protections, plaintiffs could not

show that the relief they request (a declaration and injunction under *Kan. Stan. Ann. § 50-634(c)* of the KCPA) would remedy any alleged financial loss.")

To the extent that the Plaintiffs allege violations of criminal statutes, the allegation is baseless, and there is no private remedy available even if there were such a violation. *See, e.g., Pullen v. West*, 278 Kan. 183, 199-200 (2004). Declaratory judgment concerning the criminal statutes would also be inappropriate. *See, e.g., Witschner v. Atchison*, 154 Kan. 212 (1941).

### C.    Count Three: Civil Conspiracy

Based on the same alleged violations of the KCSOA and the KCPA, the Plaintiffs claim that the Defendants engaged in a civil conspiracy. The elements of a civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof. *Meyer Land & Cattle Co. v. Lincoln County Conservation Dist.*, 29 Kan. App. 2d 746, 753 (2001). "In order for civil conspiracy to lie, the claim must base itself on a valid, actionable underlying tort." *Id.* (citing *Stoldt v. City of Toronto*, 234 Kan. 957, 967 (1984); *Knight v. Neodesha Police Dept.*, 5 Kan. App. 2d 472, 476 (1980)); *see also JP Morgan Trust Co. v. Mid-America Pipeline Co.*, 413 F. Supp. 2d 1244 (D. Kan. 2006).

The Defendants were exempt from the KCSOA. Thus, the fact that they did not register pursuant to the KCSOA was not unlawful. There is no "unlawful overt act," no "actionable underlying tort" to serve as the basis for the conspiracy claim. In addition, the

Plaintiffs admittedly were not harmed by the Defendants acts.  SOF, ¶ 57. Failing to meet at least these two elements, the Plaintiffs' conspiracy claim falters.

## CONCLUSION

The facts of this case are not in dispute. CLA successfully assisted the Plaintiffs in the reduction and elimination of their consumer debt. Admittedly unharmed by any of the Defendants' actions, the Plaintiffs now seek damages, penalties, a declaration, and an injunction on the basis that CLA was not compliant with a regulatory statute at the time these services were rendered.

But the statute upon which all claims are based was inapplicable to the Defendants. As stated by the Kansas Supreme Court, "the law firm of an attorney who is exempt from the requirements of the [KCSOA] under K.S.A. 50-1116(b) and K.S.A. 50-1117(f) is also exempt from the requirements of the act." *Hays v. Ruther*, Kan. S. Ct. No. 108,358 (November 22, 2013), at Syl. ¶ 6. At all times relevant to this suit, CLA was the law firm of an attorney exempt from the requirements of the KCSOA. It was, therefore, "also exempt from the requirements of the act." Mr. Ruther cannot be liable for the exempt actions of his firm.

In addition to the myriad of other deficiencies briefed above, the primary legal premise of the Plaintiffs' claims is incurably flawed. By virtue of their exemption from the KCSOA, summary judgment for the Defendants is appropriate on all counts.

Respectfully submitted,

s/ W. Thomas Gilman
W. Thomas Gilman #11867
REDMOND & NAZAR, L.L.P.
245 N. Waco, Suite 402
Wichita, Kansas 67202
(316) 262 8361 / (316) 263-0610 fax
wtgilman@redmondnazar.com
*Counsel for Consumer Law Associates LLC*

s/ Christopher M.Joseph
Christopher M. Joseph, #19778
JOSEPH & HOLLANDER LLC
1508 S.W. Topeka Blvd.
Topeka, Kansas 66612
(785) 234-3272 / (785) 234-3610 fax
cjoseph@josephhollander.com
*Counsel for Mr. Ruther*

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2014, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send notice of electronic filing to all counsel of record.

/s/ Christopher M. Joseph
Christopher Joseph

30